MORRIS & CUMINGS DREDGING CO. v. MORAN TOWING & TRANSPORTATION CO.

(District Court, E. D. New York. August 4, 1908.)

TOWAGE—LOSS OF TOW—LIABILITY OF TUG.

A tug *held* not liable for the injury to a scow which turned turtle while being towed to the dumping grounds and was found with a large hole in her bottom, on the ground that the tug was negligent in going out under the weather conditions, which were stormy, but not sufficiently so to sustain the charge of negligence, in the absence of evidence to sustain the burden resting on libelant to show that the injury was due to the weather or sea, rather than to some unexplained cause, such as striking an obstruction or the breaking loose of one of the pocketdoors of the scow, which seemed to be indicated by her condition.

In Admiralty.

Armstrong, Brown & Boland (Pierre M. Brown, of counsel), for libelant.

James J. Macklin, for respondent.

CHATFIELD, District Judge. Upon the 13th day of January, 1906, the Moran Transportation Company, the libelant herein, sent two of its tugs to sea towing scows loaded with mud. One of these

tugs, the Eugene F. Moran, started from Pier 58, North river, at about 11 o'clock in the morning of that day, having in tow the scow 42–M, an ordinary six-pocket dump scow, and scow 40–M, a four-pocket scow of the same sort. Going down through the Narrows the hawsers were lengthened, so that about 200 fathoms separated the tug and scow 42. Scow 40 was about 80 fathoms behind scow 42. The tug Catherine Moran was some little distance in advance of the Eugene F. Moran, and had also in tow two scows, between which the hawsers parted when outside of Sandy Hook. The Catherine Moran succeeded in dumping the other scow, but did not get entirely out to the dumping grounds, and on her return picked up the scow which had gone adrift, and towed the two scows, side by side, back to New York. When off the point of Sandy Hook, in the neighborhood of the outer fairway buoy, at about 4:30 in the afternoon, something happened to the rear scow, 40–M, in tow of the Eugene F. Moran, as a result of which she turned turtle, the scowman disappeared and has never been heard from, and shortly thereafter the scowman upon scow 42–M disappeared from the deck of his scow, and has likewise never been heard from to the present time.

The attention of the tug was called to the fact that something was wrong with scow 40 by the appearance of the scow and by the scowman waving his hat, and the tug, having cut its hawser, turned around under a port helm and was within a short distance of scow 42, when it turned over and the scowman was lost. By that time it had become dark, the sea was rough, and the tug Eugene F. Moran returned up the bay, but later went back and cruised around, seeking the scows, which were ultimately found, when day broke, on the beach upon the Jersey shore, near the Conover Beacon, not far from the point where Sandy Hook joins the mainland; scow 42 being some distance from scow 40, and having its pockets still partially filled with mud, while scow 40 was bottom up, and with a hole extending across four of the bottom planks of the scow, each of these planks being 12 inches in width. This hole was about in the middle of the bottom of the scow, and penetrated the bulkhead or air chamber running across the scow. Two of the pockets were forward of this bulkhead and two aft, and one of the doors from one of the pockets next to this air chamber or bulkhead was broken loose from its chain hinges or fastenings; also the long chain running to the gear by which the doors were opened and closed was missing from the end of the door furthest from this air chamber. These chains are some 28 feet long, and are at least 8 feet longer than the distance between the shaft and the lower corner of the door when the doors are open, and the door in question, still fastened by the chain nearest to the air chamber, was entirely out of the pocket where it belonged and over in the pocket beyond the air chamber, in such position that the corner of the door projected above the bottom of the scow, as she lay overturned on the beach, some 3 or 4 feet. It may be stated for the sake of clearness that each of the four pockets has two doors, about 20 feet long, 8 or 9 feet wide, and 8 inches thick, made of oak, bound with several hundred pounds of iron, and of such weight that they will speedily sink unless supported. These doors run fore and aft, and open from the

center downward; the chain hinges being upon the outside of each door, while the long chains running to the shaft are attached to the inside edges of the doors, which close on a line approximately corresponding to what would be the keel of the scow.

The libelant has offered testimony to show that the day was stormy and the wind strong. The government observer in New York testified that the wind increased from about 12 miles an hour in the forenoon to 28 miles for the hour between 4 and 5 o'clock p. m., and the highest velocity for five minutes at 7:52 p. m. was 40 miles an hour. Conditions of weather prevailed which the observer characterized as stormy, with a brisk wind, not severe enough to be called a hurricane or gale, coming from the northeast, and the general direction of the wind was northeast. Storm signals were displayed at Governor's Island and at Sandy Hook at 3 o'clock in the afternoon of that day. The barometer was falling during the day; but when the scows passed Governor's Island, around noon, no storm signals were flying, and the condition of the barometer was not such as to indicate a dangerous weather condition in the near future. The captains of the government patrol boats stationed off Sandy Hook to watch the movements of dumping scows estimated the wind in that neighborhood during the afternoon at about 15 miles an hour. The tide was low during the forenoon, and flood tide occurred about 9:45 p. m., so that during all the time in question the tide was running out, and the northeast wind in that locality would blow upon the port bow of a boat proceeding in the direction of the ebb tide. The captain of the government patrol boat testifies that this would cause a bad sea, and that the sea and the general weather conditions that afternoon were such that in his opinion it would not be good seamanship to attempt to go to the dumping grounds southeast of the lightship with loaded scows.

The testimony in the case shows that several other tows turned back at various points, while one or two tows succeeded in getting out, but dumped short—that is, turned around and dumped before reaching Scotland Lightship; and the Catherine Moran, which has been mentioned before, as has been said, after losing one scow through the parting of the hawser, succeeded in getting out approximately near the Scotland Lightship, where the remaining scow was dumped. Capt. Keyes testified that while some distance away he saw the rear scow, that is 40–M, in tow of the Eugene F. Moran, laboring in the sea, and that she suddenly foundered and went out of sight, while the tug proceeded with the other scow some half a mile before turning around and going back to the scow. The captain, mate, and two deckhands upon the Moran testify that the first they saw of the occurrence was that scow 40 was keeled over to port, and that the scowman was waving his hat, upon which the captain finding out that the tug could not be brought around quickly, ordered the hawser cut and proceeded back to the scow, and just before reaching her, as has been said, the scow turned turtle to port, and the scowman was lost.

The witnesses agree that the scowman upon scow 42 was on the deck of his scow as they passed that scow on the way back to scow 40; but when they returned to scow 42 the scowman was gone. Peterson, one of the deckhands upon the Eugene F. Moran, testifies that

scow 40 turned turtle, that then the hawser was cut, and the Moran went back. The captain of the Moran submitted a report, upon the 17th day of January, four days after the accident, to the United States local inspectors, and made a second statement under oath upon the 23d day of January, 1906, to the same board, both of which statements were placed in evidence, to the effect that when the tug and tow had reached the outer fairway buoy in the South Channel, at about 4:15 p. m.—

"scow 40-M turned over without any previous warning and for some reason unknown to the undersigned. Whereupon the hawser was cut between the leading scow and the tug, and said tug proceeded so as to pick up the cap-tain of the scow which had turned over, if possible."

The libelant relies strongly upon these statements of the captain, and upon the testimony of the deckhand, Peterson, to show that the scow had overturned before the accident was noticed by the tug; and the libelant claims that the testimony of Peterson is worthy of more credence than that of the other witnesses from the Eugene F. Moran as given upon the trial. But it is a significant fact that Peterson (as well as all of the other witnesses upon the Moran) testifies positively to seeing the hole in the bottom of the scow, and also that one of the doors of the scow was broken loose and was sticking up out of one of the pockets, while the scow was floating around overturned immediately after the tug reached the neighborhood of this scow when looking for the scowman. This would seem to indicate conclusively that an accident of some nature had occurred of a sufficient character to cause the sinking and overturning of the scow prior to the time of that overturning, and places upon the libelant the burden of show-ing, not only that the accident was due to the weather, but also of showing that the hole in the bottom of the scow was not a sufficient cause, at least in the absence of any direct testimony that the sinking was due to the rough weather alone.

The respondent produced a number of witnesses, who testified that, while the conditions were rough, no particular danger existed, and that the scow could proceed safely, although the turning back of other tows, and the difficulties experienced by all tows which went down the bay that day, would certainly indicate that prudence might have been shown by turning around and not going to sea until the storm abated. The burden, however, is on the libelant to show that the storm, even if it were imprudent to take the chance, was the cause of the accident. It is not enough to prove that an accident is possible under certain con-ditions; but the libelant must satisfy the court that the men in charge of the tug were negligent in proceeding, and it is believed that, apart from the other explanation of the accident, this burden has not been sustained. If it were clearly shown that scow 40 was overturned by the force of the wind and waves, or by the shifting of the scow's load, or loss of its equilibrium through action of the wind and waves alone, the only issue would be whether a prudent man would be guilty of negligence in attempting to proceed under such circumstances. It would not be sufficient merely to prove that care and a proper degree of prudence would suggest that it would be better to wait; but the tes-

timony must go further and satisfy the court that such a prudent man would not have taken the risk, and should have reasonably anticipated that an accident would happen.

But, on the contrary, not only is it doubtful whether the conditions were such that it could be held to have been negligence in proceeding under the circumstances, but also an independent and sufficient cause has been indicated in the hole in the bottom of the scow. Upon the trial the proctors for the libelant and respondent, as well as the court, went into a long examination as to the construction of the scow, and as to the parts which were missing, and the injuries which were shown at the time of repairs immediately after the accident. These repairs included recalking and the restoration of some of the parts of the dumping apparatus, and the testimony shows that the pawl, or casting of which the pawl was a part, was missing from the apparatus connected with the door which had broken loose. It is impossible to determine whether this was due to the action of the scowman, or to a break under some strain to which the shaft and chain had been subjected. But there is nothing to satisfactorily prove that the weather conditions, or any occurrence which should have been reasonably anticipated by the tug, were the proximate cause of the loss of this pawl casting, or of the overturning of the scow itself.

The respondent contends in its answer that the scow struck an obstruction, while upon the trial the explanation was suggested that, inasmuch as the depth of water at the point where the accident occurred was from 23 to 28 feet, the heavy door, weighing about two tons, hanging in a vertical position by the after chain, below the scow, might have been itself the obstruction which punched a hole in the bottom of the scow, as the scow, which drew at least 8 or 9 feet, surged up and down under the action of the waves; the length of the door being amply sufficient, if one end should strike the bottom, to cause the other end to strike the bottom of the scow as the scow came down between waves.

But, be this as it may, the burden of proof upon the libelant of showing that the condition of the weather was such as to impute negligence to the officers of the tug in proceeding does not seem to have been sustained, and the libel must be dismissed.